J-A18010-24 & J-A18011-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.N.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 241 WDA 2024 |

Appeal from the Order Entered January 29, 2024
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000149-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: N.F.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 391 WDA 2024 |

Appeal from the Order Entered January 29, 2024
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP -0000150-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: C.A.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 392 WDA 2024 |

Appeal from the Order Entered January 29, 2024
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000124-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: N.B., A MINOR | : : : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: H.M., MOTHER | | |
| | | No. 256 WDA 2024 |

Appeal from the Order Entered January 29, 2024
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000150-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: C.M., A MINOR | : : : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: H.M., MOTHER | | |
| | | No. 257 WDA 2024 |

Appeal from the Order Entered January 29, 2024
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000124-2023

| | | |
|---|---|---|
| IN THE INTEREST OF:  Z.B., A MINOR | : : : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  H.M., MOTHER | | |
| | | No. 258 WDA 2024 |

Appeal from the Order Entered January 29, 2024
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000149-2021

BEFORE:  OLSON, J., MURRAY, J., and BENDER, P.J.E.

- 2 -

MEMORANDUM BY OLSON, J.:                    **FILED: October 28, 2024**

In these consolidated cases, J.B. ("Father") and H.M. ("Mother") (collectively, "Parents") appeal from the January 29, 2024 orders entered in the Court of Common Pleas of Allegheny County that involuntarily terminated their parental rights to their biological daughters, Z.N.B., born in February 2018, and N.F.B., born in November 2019, and their biological son, C.A.M., born in November 2021 (collectively, "the Children").[1]  After careful review, we affirm.

The certified record reveals the following relevant facts and procedural history.  The Allegheny County Office of Children, Youth, and Families ("CYF" or "the Agency") became involved with this family following a February 21, 2020, report which detailed that Mother contacted Z.N.B. and N.F.B.'s aunt to care for Z.N.B. and N.F.B while Mother was intoxicated.  ***See*** Joint Exhibit 1 at 2.  When Mother later returned to retrieve Z.N.B. and N.F.B. from their aunt's care, police were contacted and would not allow the aunt to release Z.N.B. and N.F.B. to Mother's care due to Mother's heavy intoxication.  ***Id.*** Father is a Tier III sexual offender and lifelong registrant pursuant to 42 Pa.C.S.A. Subchapter H as a result of a 2001 conviction for involuntary deviate

---

[1] This Court *sua sponte* consolidated the separate notices of appeal filed by Father and Mother.  Because Parents raise identical claims to the Children concerning the same factual and procedural events, we address their appeals together in this memorandum.

sexual intercourse against a nine-year-old girl.[2]  *Id.* at 1.  Father was sentenced to a term of incarceration for a maximum sentence of fourteen years and was on probation at the time of the termination proceeding.  *Id.*; *see also* CYF Exhibit 7; *see also* Orphans' Court Opinion, 4/1/2024, at 3.

Z.N.B. and N.F.B. were taken into protective custody by CYF on March 25, 2020, and adjudicated dependent by the juvenile court on May 11, 2020. *See* Joint Exhibit 1 at 1.  At adjudication, the juvenile court found aggravated circumstances as to Parents: Father due to his status as a sex offender and Mother due to four prior involuntary terminations of her older children not subject of these appeals.  *Id.* at 3.  Despite these findings, the Agency was not relieved of its obligation to provide reasonable efforts for reunification, which the court established as Z.N.B. and N.F.B.'s respective permanency goals.  *Id.*

In furtherance of reunification, Father was ordered to, *inter alia*: successfully complete sex offender treatment; comply with probation; complete intimate partner violence ("IPV") treatment; and participate in

---

[2] Father's convicted offense of involuntary deviate sexual intercourse is a Tier III sexual offense pursuant to Pa.C.S.A. § 9799.14(d)(4).  This offense requires lifetime registration.  *See* Pa.C.S.A. § 9799.15(a)(3) ("An individual convicted of a Tier III sexual offense shall register for the life of the individual").

supervised visitation.[3] *Id.* at 3-4; *see also* Notes of Testimony ("N.T."), 1/11/2024, at 212. Mother was ordered to, *inter alia*: achieve recovery from substance abuse; complete non-offender's treatment; complete IPV treatment; and participate in supervised visitation. *See* Joint Exhibit 1 at 3-4; *see also* N.T., 1/11/2024, at 202.

CYF first filed petitions to involuntarily terminate Parents' parental rights to Z.N.B. and N.F.B. on August 19, 2021, before C.A.M.'s birth. *See* Joint Exhibit 1 at 5. Following a hearing, the orphans' court denied the petitions on January 27, 2022, "due to progress by both parents at that time and their participation in and completion of various programs." *See* Orphans' Court Opinion, 4/1/2024, at 1-2. Notwithstanding, Z.N.B and N.F.B.'s dependency matters were not discharged, and they were not returned to Parents' care. *See* N.T., 1/11/2024, at 202. Z.N.B. and N.F.B. were placed in their current pre-adoptive foster home in July 2022, where they remained at the time of the subject termination proceedings. *See* Joint Exhibit 2 at 4; *see also* N.T., 1/11/2024, at 216.

In the interim, two days after C.A.M.'s birth in November 2021, the court placed him in the protective custody of CYF. *See* Joint Exhibit 3 at 1. The

---

[3] Father was only to participate in supervised visitation after "obtain[ing] information regarding [a criminal court trial judge's] order that he can have contact with his children." *See* Joint Exhibit 1. The case from which this order originates is unclear from the certified record.

juvenile court adjudicated C.A.M. dependent on December 15, 2021. *Id.* Aggravated circumstances were found as to Parents for the same reasons as Z.N.B. and N.F.B. *Id.* at 2. The Agency was again ordered to provide reasonable efforts for reunification, which was set as C.A.M.'s respective permanency goal. *Id.* Parents' permanency goals for reunification remained as previously ordered. *See* N.T., 1/11/2024, at 202, 212. C.A.M. was placed in his current pre-adoptive foster home separate from his older siblings in December 2021 and remained there at the time of the subject termination proceedings. *See* Joint Exhibit 3 at 1; *see also* N.T., 1/11/2024, at 216.

Nevertheless, "[P]arents' progress did not hold steady" following the orders denying CYF's first termination petitions. *See* Orphans' Court Opinion, 4/1/2024, at 2. As to Father, his supervised visitation initially scheduled for once a week with 24-hour confirmation, until it was suspended in May 2023, after he struck Z.N.B. during a visit, a complete explanation of which is not included in the record. *See* N.T., 1/11/2024, at 71-72, 76, 126, 182, 184, 215, 235-236; *see also* N.T., 1/25/2024, at 89. When visitation resumed in November 2023, it was weekly supervised therapeutic visitation. *See* N.T., 1/11/2024, at 181, 215, 236. Father attended approximately sixty percent of his offered visitation. *Id.* at 76-77; *see also* N.T., 1/25/2024, at 11-12.

As to Mother, she attended approximately half of her required alcohol screens. *See* N.T., 1/11/2024, at 60-63, 66, 203. Mother also attended non-offender's treatment twice with two different providers. *Id.* at 86-87.

Two therapists who worked with Mother noted concerns about her ability to put her education from the treatment into practice. *Id.* at 88, 105, 113, 148. Of additional concern to multiple witnesses was Mother's lack of protective capacity, in part due to her continuing relationship with Father, despite the risks he poses to the Children due to his sex offender status. *Id.* at 89, 102-103, 108-109, 134-135, 137, 210-211, 243.

Mother was granted "some" unsupervised visitation in April 2022, with visits restricted to her home beginning in August 2022. *See* Joint Exhibit 2 at 4; *see also* N.T., 1/11/2024, at 70, 74, 184-185. In November 2022, visitation reverted back to supervised at the Agency due to "Mother's verbal aggression" with the Agency along with Z.N.B.'s "behaviors."[4] *See* Joint Exhibit 2 at 4; *see also* N.T., 1/11/2024, at 70, 74, 184-185; *see also* CYF Exhibits 4-6 (Permanency Review Orders, 12/12/22, at 3-4). Therapeutic visitation was implemented for some of Mother's visits with Z.N.B. and N.F.B. in September 2022. *See* N.T., 1/11/2024, at 10.

The frequency of Mother's offered visitation fluctuated over the years the Children were in care. *See* N.T., 1/11/2024, at 71, 182, 185; *see also*

_____

[4] Z.N.B.'s behaviors were being physically aggressive with N.F.B., discussing death and "people dying," and sexualized behaviors. *See* CYF Exhibits 4-6 (Permanency Review Orders, 12/12/22, at 2). Z.N.B.'s sexualized behaviors included: "speaking about adult sexual information, shaking her butt, arching her back, pantomiming humping and showing [N.F.B.] her genitals," kissing a peer at school, drawing "sexual things," and acting sexual behaviors out in play with dolls. *Id.*; *see also* N.T., 1/11/2024, at 157-158, 230-232.

Joint Exhibit 3 at 2. Mother repeatedly failed to appear at supervised visitation since August 2022. *Id.* at 72-74, 76, 80, 182-183; *see also* N.T., 1/25/2024, at 13. Ultimately, Mother's supervised visitation was reduced to once a week around October 2023, which it remained at the time of the termination hearings. *Id.* at 71, 182. In total, Mother attended approximately half of her offered visitation. *Id.* at 76; *see also* N.T., 1/25/2024, at 12-13.

On May 19, 2023, CYF filed petitions to involuntarily terminate the parental rights of Parents to the Children based upon these new circumstances. With respect to Father, CYF filed pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), (11) and (b). With respect to Mother, CYF filed pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).

The involuntary termination proceedings took place over two days: January 11 and 25, 2024. The Children, who were five, four, and two years old, respectively, were represented by KidsVoice.[5] CYF presented the

---

[5] The certified record reveals that the juvenile court appointed KidsVoice, the Children's guardian *ad litem* ("GAL") from the underlying dependency proceedings, as their legal counsel for the termination proceedings by separate orders dated August 1, 2023. *See* Orders Appointing Legal Counsel for a Child in a TPR Proceeding, 8/1/2023. In these orders, the juvenile court specifically found that "no conflict exists that would prevent KidsVoice from accepting this appointment." *Id.* Lexus Cersosimo, Esquire, of KidsVoice represented the Children's best and legal interests at the termination proceedings. Accordingly, the requirements of 23 Pa.C.S.A. § 2313(a) are met. *See In re K.M.G.*, 240 A.3d 1218, 1236, 1238 (Pa. 2020) (holding appellate courts should engage in "limited *sua sponte* review" concerning a child's statutory right to counsel in the termination context and mandating the orphans' court issue a separate order appointing counsel to represent the legal
*(Footnote Continued Next Page)*

following witnesses in support of its petitions to involuntarily terminate Parents' parental rights: Paris Sionis-Litvik, psychotherapist at Mon Yough who provided therapeutic visitation for Mother; Erica Votodian, John Oldham, and Tyler Manuel, investigators at Corporate Securities Investigation ("CSI"); Tarraca Jackson, supervisor at Allegheny County Health Department lab; Holly Gutherie, C.A.M.'s case manager at Aubrele; Janelle Crisp, therapist at Crisp Forensic Counseling; Eric Bernstein, Psy.D., expert in forensic psychology; Claire Chiavarini, supervisor of Z.N.B. and N.F.B.'s case manager at Mon Yough; and Stacey Policicchio, CYF caseworker. Mother testified on her own behalf. Father testified on his own behalf and presented the following witnesses: Bruce Goldhagen, family resource specialist with Justice Works; and S.B., Father's mother.

By orders dated January 25, 2024, and entered on January 29, 2024, the orphans' court involuntarily terminated Parents' parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(2), (8) and (b). Additionally, the orphans' court terminated Father's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(11).

Parents separately and timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P.

---

interests of a child involved in an involuntary termination matter and, if the appointed counsel also serves as GAL, to determine "prior to appointment" whether the child's dual interests did not conflict).

1925(a)(2)(i) and (b).[6] The trial court filed its Rule 1925(a) opinion on April 1, 2024.

Father presents the following issues on appeal for our review:

1. Did the [orphans'] court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Father's parental rights pursuant to Pa.C.S.[A.] § 2511(a)(2), (8), and (11)?

2. Did the [orphans'] court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of [proof] by clear and convincing evidence that termination of Father's parental rights would best serve the needs and welfare of the [C]hildren pursuant to Pa.C.S.[A.] § 2511(b)?

Father's Brief at 3.

Mother presents the following issues on appeal for our review:

1. Did the [orphans'] court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S.[A.] § 2511(a)(2) and (8)?

2. Did the [orphans'] court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of [proof] by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the [C]hildren pursuant to 23 Pa.C.S.[A.] § 2511(b)?

---

[6] On February 22, 2024, Father timely filed a singular notice of appeal with respect to the decrees, docketed at 241 WDA 2024, which failed to comply with *Commonwealth v. Walker*, 185 A.3d 969 (Pa. 2018), wherein our Supreme Court held that appellants are required to file separate notices of appeal when a single order resolves issues arising on more than one lower court docket. On March 15, 2024, this Court directed Father's counsel to file amended separate notices of appeal pursuant to *Walker*, and Father complied. *See Commonwealth v. Young*, 280 A.3d 1049, 1057 (Pa. Super. 2022) (holding that, regarding a *Walker* defect in an appeal to which Pa.R.A.P. 902 applies, the default position is to allow for correction of the defect unless good cause is shown by the opposing party).

- 10 -

3. Whether the [orphans'] court abused its discretion and/or erred as a matter of law in failing to identify the conflict of interest between [Z.N.B.'s] position and the position advocated by [Z.N.B.'s] legal counsel therefore depriving [her] of the right to effective legal counsel.

Mother's Brief at 10.

With respect to Parents' claims challenging the sufficiency of the evidence as it relates to the termination of their parental rights, our standard of review in this context is well-established:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing

- 11 -

as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

***Interest of M.E.***, 283 A.3d 820, 829-30 (Pa. Super. 2022) (cleaned up).

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. ***Id.*** at 830; ***see also*** 23 Pa.C.S.A. § 2511(a)(1)-(11). If the orphans' court determines the petitioner has established grounds for termination under one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to Section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. ***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013); ***see also*** 23 Pa.C.S.A. § 2511(b).

Our analysis in these appeals will focus upon Sections 2511(a)(2), (11), and (b),[7] which provide as follows:

**(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without

---

[7] This Court need only agree with the orphans' court's determination as to any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm termination. ***See M.E.***, 283 A.3d at 830 (citing ***In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*)). Based on this disposition, we need not consider Parents' arguments with respect to the additional subsections of 2511(a).

essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . .

(11) The parent is required to register as a sexual offender under 42 Pa.C.S.[A.] Ch. 97 Subch. H (relating to registration of sexual offenders) or I (relating to continued registration of sexual offenders) or to register with a sexual offender registry in another jurisdiction or foreign country.

. . .

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (11), (b).

In order to satisfy Section 2511(a)(2), the petitioning party must establish: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied."

*In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021). Grounds for termination pursuant to section 2511(a)(2), however, "are not limited to affirmative misconduct, but concern parental incapacity that cannot be

- 13 -

remedied." *Id*. (citing *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010)).

In reviewing the orphans' court's findings pursuant to section 2511(a)(2), we remain mindful that "[p]arents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *A.H.*, 247 A.3d at 443.

As to Section 2511(a)(11), this Court has observed that "[t]he language of the statute provides that, when the parent is required to register as a sexual offender, the court may terminate the parent's rights." *Interest of R.C.*, 283 A.3d 380, 2022 WL 2815368, at *6 (Pa. Super. July 19, 2022) (non-precedential decision) (emphasis omitted). Of particular note, "Section 2511(a)(11) does not mandate further inquiry into the parents' actions. The sole condition is that the parent is required to register as a sexual offender." *Id.* (citing *Interest of Z.F.Q.*, 272 A.3d 451, 2022 WL 34288, at *3 (Pa. Super. Jan. 4, 2022) (non-precedential decision)). Indeed, this Court has strongly suggested that litigants are "estopped" from challenging the validity of their registration status, or the underlying criminal convictions, in parental termination proceedings. *Z.F.Q.*, 272 A.3d at *4.

If the orphans' court concludes that adequate grounds for termination exist pursuant to Section 2511(a), the court then turns to Section 2511(b), which requires that it "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A.

§ 2511(b); *see also T.S.M.*, 71 A.3d at 267. Our Supreme Court has generally outlined this inquiry as follows:

> [C]ourts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent.
>
> Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis. We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. Thus, the court must determine each child's specific needs.
>
> Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The courts must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

*Interest of K.T.*, 296 A.3d 1085, 1105-06 (Pa. 2023) (cleaned up).

The Court further explained that "[i]t is only a necessary and beneficial bond, after all, that should be maintained." *Id.* at 1109. The Court highlighted that orphans' courts "must evaluate whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." *Id.* Such evaluation includes consideration of "the effect of severing a child's bond with her parent." *Id.* The *K.T.* Court described the "severance of a necessary and beneficial relationship [as] the kind of loss that would predictably cause 'extreme emotional consequences' or significant, irreparable

harm." *Id.* at 1109-10 (citing *In re E.M.*, 620 A.2d 481, 484 (Pa. 1993) (subsequent citations omitted)). The Court recognized that bond, permanency, stability, and all other intangibles are "all of 'primary' importance in the Section 2511(b) analysis." *Id.* at 1109.

In considering the affection which a child may have for his or her natural parents, this Court has stated the following:

> [C]oncluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted). This Court has clarified that it is "within the discretion of the orphans' court to prioritize the safety and security" of children "over their bonds with their parents." *M.E.*, 283 A.3d at 839 (cleaned up). It is within the province of the orphans' court to "consider the totality of the circumstances when performing a needs and welfare analysis." *Id.* We will not disturb such an assessment if the orphans' court's factual findings are supported by the record. *Id.*

With respect to Father's challenge to Section 2511(a)(11), Father argues that the trial court had discretion to determine, and therefore was not mandated, to terminate Father's parental rights due to his status as a sex offender.[8] **See** Father's Brief at 18. Specifically, Father argues that his status as a sex offender "must be weighed against the best needs and welfare of the Children" because he "has made significant progress in his sex offender treatment and currently exhibits a low risk of recidivism." **Id.**

The orphans' court summarized its relevant findings as follows:

> In this case, no party disputes that Father is required to register as a sex offender. . . . [T]he evidence is clear and convincing that Father cannot surmount this hurdle with the superficial progress he made.

Orphans' Court Opinion, 4/1/2024, at 16.

As noted above, Section 2511(a)(11) allows the orphans' court to terminate parental rights upon clear and convincing evidence that a parent is required to register as a sex offender. **See** 23 Pa.C.S.A. § 2511(a)(11). As Father argues, this provision affords the court discretion to terminate based upon a parent's requirement to register as a sex offender because the term "may" is permissive. **See Lorino v. Workers' Comp. Appeal Bd.**, 266 A.3d 487, 493 (Pa. 2021) ("The term 'shall' establishes a mandatory duty, whereas

---

[8] We note that Father's sole legal authority cited, **In re K.M.L.**, 2018 Pa. Super. Unpub. LEXIS 1178 (Pa. Super. 2018), is a non-precedential decision that pre-dates May 1, 2019. Thus, it does not have persuasive value pursuant to Pa. OP Super. Ct. 65.37(b).

the term 'may' connotates an act that is permissive, but not mandated or required."). The straightforward language of Section 2511(a)(11) solely requires that the court determine whether the petitioner proved the "parent is required to register as a sexual offender under 42 Pa.C.S. Ch. 97 subsection H (registration of sexual offenders) or I (continued registration of sexual offenders) or a registry in another jurisdiction or county." *See* 23 Pa.C.S.A. § 2511(a)(11). Father's argument that his sex offender status must be weighed against the needs and welfare of the Children pertains to Section 2511(b), which will be addressed *infra*.

Instantly, the orphans' court concluded the undisputed, joint stipulation between CYF and Father that he is a Tier III sexual offender and a lifelong registrant, along with Father's criminal record to the underlying offense, established that Father was required to register as a sex offender. *See* Joint Exhibit 4 at 2; *see also* CYF Exhibit 7. This alone was sufficient to establish grounds for termination under Section 2511(a)(11). Thus, we discern no abuse of discretion or error of law in the orphans' court holding that termination was warranted as to Father pursuant to Section 2511(a)(11).

With respect to Mother's challenge to Section 2511(a)(2), she contests the sufficiency of the evidence. *See* Mother's Brief at 25. Specifically, Mother asserts that the record was devoid of evidence that she was using alcohol, unable to protect the Children, or that she was communicating with Father beyond a co-parenting relationship. *Id.* at 25-26. We disagree.

The orphans' court summarized its relevant findings as follows:

Mother fared . . . poorly with her attendance at drug screens required to ensure her sobriety. Mother attended only about half of her screens, and from August of 2022 onward, her no-shows increased.

. . .

Given that the concern was alcohol, no show – not appearing was a significant concern for the [c]ourt because of the lack of time that alcohol would remain in her system. . . [T]he inconsistency leaves the [c]ourt with no other way of managing the requirement to attend the screen[s] and the failure to do so with a concern that [M]other perhaps had relapsed.

. . .

Mother did attend non-offender treatment, but she did not demonstrate reliability in putting theory into practice, as she continued to have a relationship with Father, turning to him repeatedly as a support system despite the risks to the Children. Mother compounded the problem by being dishonest about her contact with Father on multiple occasions.

Orphans' Court Opinion, 4/1/2024, at 21-22; *see also* N.T., 1/25/2024, at 142-143.

The orphans' court findings are supported by the record evidence. It is clearly established that Mother suffers from repeated and continued incapacities or refusals, namely, her alcohol abuse issues and her lack of capacity to protect the Children. Ms. Policicchio, the CYF caseworker, testified that the Agency's concerns about Mother's alcohol abuse and lack of protective capacity, in part due to her continuing relationship with Father, persisted at the time of the termination proceedings. *See* N.T., 1/11/2024, at 203, 205-206, 210-212.

The Agency has been aware of Mother's alcohol abuse since 2010 based on its involvement with Mother's older children. *Id.* at 202; *see also* Joint Exhibit 3 at 2. Mother participated in two treatment programs during the Children's dependency proceedings: one at Pennsylvania Organization for Women in Early Recovery ("POWER"), which she attended around March 2020 and did not successfully complete; and one at Gateway, which she did successfully complete in March 2022. *See* N.T., 1/11/2024, at 202-203; *see also* N.T., 1/25/2024, at 35, 75-76.

Ms. Jackson of Allegheny County Health Department testified that Mother was called in for alcohol urine screens ninety-seven times since January 2022. *See* N.T., 1/11/2024, at 66. Mother attended fifty-four screens and failed to appear forty-three times. *Id.* Mother failed to appear at screens for multiple weeks at a time with large gaps in attendance, resulting in the Agency's concern about continued alcohol use. *Id.* at 62-63, 203. Further, the juvenile court provided Mother the opportunity to be relieved of the obligation to provide screens if she provided eight consecutive screens, but Mother never complied with the court's offer. *Id.* at 204; *see also* N.T., 1/25/2024, at 40. The last screen Mother attended was October 25, 2023, no-showing for all subsequent screens, even after the termination petitions had been filed. *See* N.T., 1/11/2024, at 61. Mother blamed her nonattendance at the screens on multiple reasons, which the orphans' court

did not find credible.[9]  *See* N.T., 1/25/2024, at 38-40; *see also* Orphans' Court Opinion, 4/1/2024, at 23.  Indeed, the competent evidence supports the orphans' court's finding that Mother has not overcome her alcohol abuse issues.

As to Mother's lack of protective capacity, the primary concern was her continued relationship with Father due to his sex offender status.  *See* N.T., 1/11/2024, at 89, 102-103, 108-109, 134-135, 137, 210-211, 243.  Mother had been proven to be dishonest about her relationship with Father regarding C.A.M.'s paternity, claiming C.A.M.'s father was deceased until Father ultimately admitted to paternity.  *Id.* at 206, 226, 239.  Mother's counselor Ms. Crisp testified that she was "very concerned" about Mother's "lack of honesty" regarding Father.  *Id.* at 92, 111.  Concerns about Parents' honesty regarding their continued relationship persisted, and the Agency enlisted CSI to surveil Parents.  *Id.* at 26, 205-206, 226.  CSI conducted approximately three periods of surveillance from December 2021 until about April 2023.  *Id.* at 26, 28.  Three CSI investigators testified to observing Father's vehicles, along with him coming and going from Mother's residence on numerous occasions, which the orphans' court found credible.  *Id.* at 29-30, 34-36,

---

[9] Mother blamed her nonattendance on: scheduling issues with work, although she refused to provide CYF with her work schedule; complaints that she could not attend at the same time for every screen, although CYF stated they would not be truly random if they were regularly scheduled; and not reading her emails. *See* N.T., 1/25/2024, at 38-40; *see also* N.T., 1/11/2024, at 204, 227, 241.

45-47; *see also* Orphans' Court Opinion, 4/1/2024, at 23. Ms. Policicchio testified that she would not expect Parents to be together as often as they were observed if they were strictly co-parenting. *See* N.T., 1/11/2024, at 241.

The concern about Mother's lack of protective capacity due to her ongoing relationship with Father is best summarized by Ms. Crisp, as follows:

> So my concern is that [Mother] knows the non-offender content. We went over it almost weekly for [eleven] months. I know she knew the risk of making her support person[, Father,] that has Megan's Law [r]egistration with the kids. For her children, whether she has custody of them or not. So . . . my concern is that she didn't care. . . she was putting her support person before the concern of what CYF was going to have to say about or what the hearing officer or [j]udge is going to have to say about it or what I have to say about it or anyone else.
>
> . . .
>
> I do agree that support matters with relapse prevention in terms of drug and alcohol. . . . But at what cost?

N.T., 1/11/2024, at 102-103. Dr. Berstein echoed these concerns, stating one of the issues with Mother's protective capacity is the translation of her education from non-offender's treatment into actions and whether she would prioritize the Children's safety over "compromising any contact or relationship with [Father]." *Id.* at 135, 138, 148. Ms. Policicchio expressed the same concerns. *Id.* at 210-211. Mother dismisses these concerns as "speculative," but we must disagree as the concerns were corroborated by multiple witnesses. Mother's claim that she is strictly in a co-parenting relationship with Father is belied by the foregoing testimonial evidence.

Further, Mother's responses to Z.N.B.'s sexual acting out and allegations of sexual abuse contributed to Mother's lack of protective capacity. Z.N.B. made sexual allegations against a brother who is not subject to the instant appeals. *See* N.T., 1/11/2024, at 13. Mother denied these allegations and proceeded to bring this brother to a visit with Z.N.B. after the allegations were made. *Id.* at 14, 209, 211, 214. Dr. Bernstein and Ms. Policicchio detailed an extensive collection of behaviors that evidenced Z.N.B. had been sexually acting out, as discussed *supra*, and Mother again denied the allegations and even delayed Z.N.B. receiving therapy by refusing to provide consent. *Id.* at 157-158, 208-209, 230-232.

The foregoing evidence clearly supports the court's finding that Mother lacked the protective capacity to care for the Children. We, therefore, readily conclude that the totality of the previously detailed evidence establishes that Mother suffered from repeated and continued parental incapacities or refusals, which have caused the Children to be without essential parental care, control, and subsistence.

Likewise, the certified record thoroughly supports the conclusion that Mother has resolved neither her alcohol abuse nor her lack of protective capacity. Mother has been involved with the Agency for well over a decade due to her alcohol abuse and the competent evidence discussed above supports the orphans' court conclusion that Mother cannot or will not remedy this issue. Further, the Agency provided ample evidence, also discussed

above, that Mother's lack of protective capacity persisted despite Mother's completion of non-offender's treatment twice over the many years the Children have been removed from her care.

This evidence and testimony support the orphans' court's conclusion that Mother's incapacities or refusals related to alcohol abuse and lack of protective capacity cannot, or will not, be remedied. Accordingly, we observe no abuse of discretion or error of law in the orphans' court holding that termination was warranted pursuant to Section 2511(a)(2).

Parents advance identical arguments for their challenges to the orphans' court's findings pursuant to Section 2511(b). Specifically, Parents assert that "the sole expert witness testified that [Parents] fulfill an important connection for [the] Children" and "[t]he Children derive invaluable and irreplaceable benefits from [Parents'] love, affection, and familial ancestry from their relationship with [Parents.]" *See* Father's Brief at 20; *see also* Mother's Brief at 29 (cleaned up). We must disagree.

The orphans' court summarized its relevant findings as follows:

By all accounts, [the] Children have loving, supportive foster homes and are nicely bonded to their foster parents. As to their bonds with [Parents], this [c]ourt credited and agreed with Dr. Bernstein's testimony that while those bonds exist, they are not necessary, and none the Children would suffer a serious detriment by termination of [Parents'] rights. What would be detrimental for [Z.N.B. and N.F.B] would be causing them to continue in their state of instability after four years in limbo. Similarly, [C.A.M.] is strongly bonded to his foster parents and is likely to suffer trauma if that bond is broken, not if [Parents'] rights are terminated.

Orphans' Court Opinion, 4/1/2024, at 26-27.

The orphans' court's findings are supported by the record evidence. Father attended thirty-eight out of sixty-nine visits offered through Aubrele and twenty-three out of thirty-five visits offered through Mon Yough.[10] *See* N.T., 1/11/2024, at 76; *see also* N.T., 1/25/2024, at 11-12. Mr. Sionis-Litvik testified that Z.N.B. and N.F.B. did not convey positive sentiments towards Father and expressed not wanting to visit with him due to being "hit" by him. *See* N.T., 1/11/2024, at 23. Dr. Bernstein testified that the Children look to Father as "having fun and receiving support during isolated visit[ation] period[s]," not relying on him as their psychological parent, although Z.N.B. and N.F.B. do recognize him as their father. *Id.* at 125. Dr. Bernstein testified that C.A.M. is less likely to recognize Father as his father. *Id.*

Mother attended fifty-two out of ninety-five visits offered through Aubrele and seventy out of 128 visits offered through Mon Yough. *See* N.T., 1/11/2024, at 76; *see also* N.T., 1/25/2024, at 12. Mother did not attend any available visitation with Z.N.B. and N.F.B. from October 28, 2023 until January 9, 2024, two days before the beginning of the termination proceedings. *See* N.T., 1/11/2024, at 188. Mother testified that she missed visits due to an array of reasons, which again the orphans' court did not find

---

[10] Aubrele is C.A.M.'s foster care agency. Mon Yough is Z.N.B. and N.F.B.'s foster care agency.

credible.[11]  *See* N.T., 1/25/2024, at 48-50, 60; *see also* Orphans' Court Opinion, 4/1/2024, at 23.  Several witnesses stated that Mother's repeated failure to appear had negative impacts on the Children, causing them to feel emotions such as disappointment, confusion, anger, and self-blame.  *See* N.T., 1/11/2024, at 15, 135-136; *see also* 1/25/2024, at 13.  Dr. Bernstein testified that the Children recognize her as their mother, responded to her support, and N.F.B. was affectionate with her.  *Id.* at 125-126.

Accordingly, we discern no abuse of discretion by the orphans' court finding the bonds between Parents and the Children were not necessary and beneficial.  There is some evidence that the Children harbor affection for Parents, but this is not sufficient to find a necessary and beneficial bond between Parents and the Children.  *See K.K.R.-S.*, 958 A.2d at 535.  Indeed, Dr. Bernstein declined to describe the bonds between Parents and the Children as necessary and beneficial when specifically questioned on the topic, stating that was not his position.  *See* N.T., 1/11/2024, at 132-133, 137-138.  As the orphans' court detailed in its findings above, it conducted the required consideration of the effect termination of parental rights would have on the Children and credited Dr. Bernstein's testimony that the Children would not

---

[11] Mother testified that she missed visits due to sickness, mental health issues, car troubles, feeling "unsafe" with her case manager from Mon Yough, being "stuck" babysitting other children, and prioritizing work over her visitation with the Children.  *See* N.T., 1/25/2024, at 48-50, 60.

suffer extreme emotional consequences as a result. *Id.* at 144-145; *see also* *K.T.*, 296 A.3d at 1109-10.

Further, the orphans' court aptly considered the Children's need for permanency. There is no dispute that Z.N.B. and N.F.B. had been removed from Parents' care for four years and C.A.M. the entirety of his two years of life. Z.N.B. and N.F.B. have been with their pre-adoptive foster parent since July 2022, and C.A.M. has consistently been placed with his pre-adoptive foster parent since December 2021. *See* Joint Exhibit 2 at 4; *See* Joint Exhibit 3 at 1; *see also* N.T., 1/11/2024, at 216. The orphans' court also considered the Children's bonds with their respective foster parents, as noted above, which was testified to by multiple witnesses who described how the Children have strong bonds to their foster parents and are well cared for by them. *See* N.T., 1/11/2024, at 75-76, 139-141, 144-145, 208-209, 217.

Based upon the testimonial evidence set forth above, we discern no abuse of discretion or error of law in the orphans' court's conclusion that CYF met their evidentiary burden pursuant to section 2511(b). Our Supreme Court stated in *K.T.* that the considerations that contribute to an orphans' court's Section 2511(b) analysis are all of primary importance. *K.T.*, 296 A.3d at 1109. Instantly, the orphans' court made all the requisite considerations as part of its analysis. Moreover, the orphans' court was within their discretion to prioritize the Children's intangibles, including their safety and security, over

their bond with Parents. *M.E.*, 283 A.3d at 839. Thus, we affirm the orphan's court's findings with respect to termination of Parent's parental rights.

With respect to Mother's issue regarding the Children's legal counsel, we note that the requirements of 23 Pa.C.S.A. § 2313(a) were met, as addressed *supra*. Preliminarily, we note that Mother does not raise issues with respect to N.F.B. or C.A.M.'s legal counsel in her concise statements or in her statement of questions involved in her appellate brief. Accordingly, this issue as to N.F.B. and C.A.M. is waived. *See In re M.Z.T.M.W.*, 163 A.3d 462, 466 (Pa. Super. 2017) (reiterating that issues not included in a concise statement of errors complained of on appeal and statement of questions involved are waived).

We discern that Mother's argument is essentially that Attorney Cersosimo of KidsVoice failed to advocate for Z.N.B.'s legal interests. *See* Mother's Brief at 32. Specifically, Mother baldly asserts that "the record is clear that [Z.N.B.] wanted to reunify with Mother." *Id.* We disagree.

Our Supreme Court has held that "[a]n attorney acting as a child's legal counsel must, at a minimum, attempt to ascertain the child's preference and advocate on the child's behalf," legal counsel for a child is accorded "significant deference" in their role. *In re P.G.F*, 247 A.3d 955, 966 (Pa. 2021). Attorney Cersosimo provided the orphans' court with the following relevant explanation:

> I recently had the chance to visit with [the Children]. . . . As for five-year-old [Z.N.B.], we were able to discuss her forever home

and what it would mean to be adopted. Based on this conversation, [Z.N.B.] was able to express a desire to be adopted.

N.T., 1/25/2024, at 134-135. Attorney Cersosimo's approach was consistent with our case law. *See P.G.F*, 247 A.3d at 966 ("[w]e will not mandate that an attorney convey highly sensitive, significant, and potentially emotionally damaging information to a child, or engage in a raw inquiry, merely to discern the clearest indication of a child's preference"); *see also In re T.S.*, 192 A.3d 1080, 1082 n.2 (Pa. 2018) ("'[l]egal interests' denotes that an attorney is to express the child's wishes to the court regardless of whether the attorney agrees with the child's recommendation").

Mother relies on *In the Interest of D.N.G.*, 230 A.3d 361 (Pa. Super. 2020), but the case *sub judice* is clearly distinguishable. In *D.N.G.*, this Court found that the eleven-year-old child's legal counsel failed to zealously advocate for the child's legal interests when counsel advised the court of the child's unequivocal preference not to be adopted, yet advocated for termination. *D.N.G.*, 230 A.3d at 367. Instantly, Attorney Cersosimo ascertained five-year-old Z.N.B.'s preference, which was for adoption. Most importantly, Mother fails to cite any record evidence as to her claim that the record clearly showed that Z.N.B. wanted to reunify with her. *See* Mother's Brief at 32. This Court's careful review of the certified record revealed no such

"clear" evidence.[12] The record evidence does not contradict counsel's assertion of Z.N.B.'s desire. Accordingly, Mother's arguments lack factual basis, legal basis, and merit. As such, we discern no abuse of discretion or error of law in the orphans' court's appointment of KidsVoice's continued dual representation for the Children.

Thus, we affirm the decrees pursuant to 23 Pa.C.S.A. § 2511(a)(2), (11), and (b).

Decrees affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 10/28/2024

---

[12] As Mother left this Court to scour the certified record for this alleged evidence, we best discern that she is referencing testimony from Mr. Sionis-Litvik which discussed how Z.N.B. questioned when she would return home, without clarifying which home she was referencing. **See** N.T., 1/11/2024, at 12. Mr. Sionis-Litvik further explained that this was common for children of Z.N.B.'s age in foster care, which the orphans' court found credible. **Id.** at 18-19, 24; **see also** Orphans' Court Opinion, 4/1/2024, at 24.