J-A02021-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: R.R.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1049 WDA 2024 |

Appeal from the Order Entered July 17, 2024
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000016-2024

BEFORE: KUNSELMAN, J., MURRAY, J., and BECK, J.

MEMORANDUM BY MURRAY, J.:                    **FILED: January 17, 2025**

J.B. (Mother) appeals from the order granting the petition filed by the Allegheny County Office of Children, Youth, and Families (the Agency or CYF), and involuntarily terminating Mother's parental rights to R.R.B. (a daughter born November 2022) (Child).[1] Upon careful review, we affirm.

The trial court summarized the factual and procedural history underlying this appeal:

> [Child] was Mother's seventh child in nine pregnancies. [N.T., 7/15/24,] at 52. At [] Child's birth, Mother had an open[] CYF case with her sixth child. Soon after [] Child's birth, [a] CYF caseworker[2] went to the hospital to interview Mother and assess for safety. *Id.* The caseworker observed that Mother was having

---

[1] The trial court also involuntarily terminated the parental rights of Child's biological father, J.L. (Father). Father is not a party to the instant appeal.

[2] The certified record does not disclose the identity of the CYF caseworker who initially met with Mother.

difficulties feeding [Child] and [properly] supporting [] Child's head. *Id.* Mother reported to the caseworker that she was transient, homeless, and [had] experienced intimate partner violence [(IVP)] with [F]ather, which Mother had previously reported to CYF prior to [] Child's birth. *Id.* …. Father, who lived [outside of Allegheny County] and worked out of state, could not assume care of [Child]…. *Id.* at 54. CYF removed [] Child upon discharge from the hospital and placed [] Child into a foster home.[3] *Id.* at 55.

… The court made the following findings of fact at the [subsequent] shelter care hearing: "Mother is intellectually disabled and has a CYF history that includes prior [termination of parental rights (TPR) cases]. Achieva[4] has reported that Mother requires 24/7 supervision in order to care for [] Child." *Id.*

The [trial court] adjudicated [Child] dependent on December 14, 2022, with Mother agreeing to multiple [allegations] within the petition. *Id.* at 55; *see also* Joint Exhibit A - Joint Stipulations; *see also* CYF Exhibit 3 - Combined Court Orders. The court order directed Mother to continue to work with Achieva, her behavioral health services, and her in-home services, which were already in place with respect to [Mother's] open case [for] her older child. CYF Exhibit 3 - Combined Court Orders. The court ordered that [] Child remain in foster care[,] and [directed that] visitation with Mother was to be supervised by Achieva. *Id.* … The [trial] court found that aggravated circumstances existed[,] but ordered reasonable efforts [for reunification] to continue for Mother[.] *Id.*

At or shortly after the adjudication[ hearing], goals to reunify were identified for Mother …. Due to Mother's difficulties with making and following up with medical appointments, CYF was appointed secondary medical decision maker. *Id.* at 59. Mother's goals were to obtain appropriate housing, complete [IPV] counseling, work with Achieva for parenting, and participate in mental health treatment. *Id.*; *see also* CYF Exhibit 3 - Combined

---

[3] Child continues to reside with the same pre-adoptive foster family.

[4] At the TPR hearing, Achieva employee Britanee Adams (Ms. Adams) testified that "Achieva supports individuals who have intellectual and physical disabilities." N.T., 7/15/24, at 28.

Court Orders. The housing, mental health, and [IPV] goals were critical to improving [Mother's] personal stability, which would allow her to focus on the most critical goal in this case: parenting. *Id.* at 58. In order to remedy the conditions that necessitated removal, Mother needed to be able to demonstrate that she could, *inter alia*, appropriately diaper [and] feed [Child], make and attend medical appointments, and complete any recommended follow-up after the appointments for [] Child. *Id.* at 56.

Trial Court Opinion, 8/30/24, at 2-5 (some capitalization modified; footnotes in original omitted; three footnotes added).

The trial court held permanency review hearings in March, June, September, and December 2023; and February and May 2024. Although the trial court consistently found Mother to have moderately complied with her permanency plan, Mother showed minimal progress towards alleviating the circumstances necessitating Child's placement. By September 2023, Mother had completed an IPV program, obtained independent housing, and consistently worked with Achieva to attempt to improve her parenting skills. *See id.* at 5-6. Additionally, Mother visited Child, supervised by Achieva, twice weekly for three hours per visit. *See id.* at 6, 18. At the September permanency review hearing, the trial court authorized unsupervised visitation for fifteen minutes per supervised visit. *Id.*

At the February 2024 permanency review hearing, the trial court made extensive findings, including the following:

Child had significant developmental delays; [] Child was nearly 16 months old and functioned like a 6[-]month[-]old; [] Child wasn't sleeping through the night and the[r]e were some early signs of autism; [] Child was being overwhelmed with the visitation schedule and all of her early intervention therapies[,] such that

- 3 -

her functioning and development was being impacted; there were no additional programs [that court-ordered psychologist Patricia Pepe, Ph.D. (Dr. Pepe),] could identify other than Achieva for Mother[;] and neither Mother nor Father, per Dr. Pepe, had the capacity to parent [] Child. The [trial court noted] that Mother didn't want the early intervention services scheduled during her visits and [there were] instances where Mother got upset about noise …, requiring assistance in Mother's de[-]escalation. … [The trial court found that the above were] historic issues with Mother. … As a result, [] Child was ordered to remain in her foster home[,] and Mother's supervised visits with Achieva were reduced to once a week, supervised.

*Id.* at 8-9 (record citations omitted).

On February 26, 2024, CYF filed a petition to involuntarily terminate Mother's parental rights to Child, pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). CYF claimed Mother was "unable to parent [Child] as she has failed to comply with, or make sufficient progress on, the goals/outcomes established for her by []CYF or in court orders." TPR Petition, 2/26/24, ¶ 9.

On July 15, 2024, the trial court held an evidentiary hearing on the TPR petition. Mother attended, represented by counsel. Child did not attend but was represented by legal counsel.[5] CYF called as witnesses Dr. Pepe,[6] Ms. Adams, and CYF casework supervisor Mitchell Amago (Mr. Amago). Mother

---

[5] Child's counsel indicated that "[d]ue to [Child's] age and development[,] she was unable to formulate a subjective, articulable position …." N.T., 7/15/24, at 147; *see also In re Q.R.D.*, 214 A.3d 233, 240 (Pa. Super. 2019) ("[I]f the preferred outcome of a child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests." (citation and brackets omitted)).

[6] At the TPR hearing, CYF entered, without objection, Dr. Pepe's written evaluations. N.T., 7/15/24, at 5.

- 4 -

testified on her own behalf, and presented the testimony of Kathy Reilly (Ms. Reilly), Residential Director of Genesis of Pittsburgh, a nonprofit social services agency.

Dr. Pepe explained that, initially, the volume of visits with Mother, visits with Father, feeding clinics, and "multiple therapies," overwhelmed Child, and impacted her ability to develop a regular schedule. *Id.* at 16-17. Dr. Pepe testified that Child "has done tremendously" since the trial court reduced Mother's visitation. N.T., 7/15/24, at 15; *see also id.* at 15 (Dr. Pepe testifying that "[i]t was amazing to see the change," after Mother's visitation was reduced). Dr. Pepe further testified concerning "some problems" Mother had during her visits with Child, including feeding issues; the improper use of vaginal cream, which risked urinary tract infections; and interference with Child's speech therapy. *See id.* at 17-19.

Dr. Pepe testified as follows concerning her last evaluation of Mother:

I talked to [Mother] about how she can parent [Child], and [Mother] said she was learning from the feeding therapist [] that things had to be pureed [for Child]. I was trying to get an understanding of how [Mother] perceived that, because the information that I had from the Alliance [for] Infants is that they repeatedly had to redirect [Mother] with portions. …

… [T]here were all these material objects that [Mother] thought would meet [C]hild's needs. [Mother] was engrossed with … the organizations [she thought] could provide her with [resources] for [Child], but didn't quite … understand[] what her role is. …

But the concern I had was what became evident in the interactional[ evaluation. Mother] show[ed Child] picture books, [but] unfortunately[, Mother] was not able to read those books.

[Child] is obviously a little too young to brush her teeth, so giving her appropriate food is important, but I don't think that [Mother] had a clear idea of how to address [C]hild's developmental needs on a day-to-day basis.

….

So my concern was that [Mother] really didn't have a perception of what kind of parental [skills] were necessary in order to meet [Child's] needs, [] to encourage [Child's] developmental growth, to … address [Child's] special needs ….

*Id.* at 21-22.

Concerning Child's bond with her foster parents, Dr. Pepe confirmed that Child has "a strong bond [with] and secure attachment" to foster parents. *Id.* at 25. Child "easily engaged with" foster parents, "was very happy," and "was always smiling" when around her foster parents. *Id.* at 25-26.

Ms. Adams testified that she began supervising Mother's visits with Child through Achieva in April 2024. *See id.* at 28. Mother had been working with Achieva to improve her parenting skills with Child since March 2023; however, Mother initially began working with Achieva in October 2013 to assist Mother with caring for her other biological children. *See id.* at 45. Regarding feeding Child, Ms. Adams testified that Mother required assistance to measure food for Child, noting that "[a]s [Child's] needs change, so do[] the measurements of food and things of that nature." *Id.* at 32; *see also id.* at 40 (Ms. Adams testifying, "[I]f you give [Mother] … a cup that says two ounces, then she knows this is two ounces. As far as putting calculations together, say I have one ounce and I need to add another ounce, [Mother] is unable to make that

calculation."). Ms. Adams testified that Mother "has made progress[,]" but "will continue to need[] education and support[.]" *Id.* at 42.

Mr. Amago testified he began supervising Mother through CYF in December 2021. *See id.* at 47. Mother initially came to CYF's attention in 2013. *See id.* Mr. Amago testified Mother had nine children, "two of [whom] were stillborn, one [of whom] resides with [his or her biological] father, [Child], and [five] other children [Mother] had her rights terminated to." *Id.* at 53. Mr. Amago testified that, due to the recent termination of Mother's parental rights to another child, a CYF caseworker visited Mother in the hospital after Child's birth. *Id.* The caseworker observed Mother "having difficulty supporting [C]hild's head[,]" as well as issues feeding Child. *Id.* Mother reported to the caseworker concerns about homelessness and IPV. *Id.*

Mr. Amago testified that Mother had been cooperative with Achieva and regularly visited Child; however, the Agency continued to have concerns regarding Mother's ability to care for Child:

> [O]ur concern continues to be that [Mother] continues to need hands-on support to effectively feed [C]hild, which is a basic need [of C]hild…. It historically has been a concern. I don't think there has been significant progress in that regard. I think [Mother has] moved in the right direction, **but I don't think it's significant progress.**

*Id.* at 58-59 (emphasis added).

Mr. Amago further opined that there was not a "necessary and beneficial bond between [Child] and [Mother,]" and "[i]t's very clear that [Child] identifies [foster parents] as her parental figures[.]" *Id*. at 75-76. Mr. Amago

testified that Child made significant progress under the care of her foster parents, and that Child "is doing far better than … a lot of people would have thought." *Id.* at 76.

Mother called Ms. Reilly to testify regarding her observations of Mother since Mother began working with Genesis House on August 5, 2022. *Id.* at 111. Ms. Reilly testified that Mother completed parenting and "newborn care" classes offered by Genesis House. *Id.* at 113. Although Mother had initially been prone to outbursts, Ms. Reilly explained that, over time, Mother learned to better regulate her emotions. *Id.* at 114; *see id.* (Ms. Reilly testifying that Mother "still gets upset and focuses on things, but she's recognizing that now and has … controlled that."). Ms. Reilly further testified that she observed Mother feed and diaper Child on one occasion, and did not see any "issues." *Id.*

Finally, Mother testified that she had improved her parenting skills after attending court-ordered classes through Achieva. *Id.* at 123. Mother acknowledged having difficulties reading and measuring food for Child, but indicated that she was "in the process of fixing that." *Id.* at 124. Mother agreed that if she needed assistance for herself or Child, she would seek it out. *Id.* at 131-32. Despite attending numerous feeding clinics, however, Mother still required help to measure appropriate food portions for Child. *Id.* at 133.

On July 17, 2024, the trial court filed an order involuntarily terminating Mother's parental rights to Child, pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). Mother filed a timely notice of appeal and contemporaneous Pa.R.A.P. 1925(a)(2)(i) concise statement. On August 30, 2024, the trial court filed a Rule 1925(a) opinion.[7]

Mother presents the following issues:

1. Did the trial court abuse its discretion and/or err as a matter of law by involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2)?

2. Did the trial court abuse its discretion and/or err as a matter of law by involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(5)?

3. Did the trial court abuse its discretion and/or err as a matter of law by involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8)?

4. Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights

---

[7] In its opinion, the trial court opines Mother waived her issues on appeal for failing to allege the trial court's purported errors with sufficient specificity. Trial Court Opinion, 8/30/24, at 14; *see also Commonwealth v. Vurimindi*, 200 A.3d 1031, 1038 (Pa. Super. 2018) ("A concise statement which is too vague to allow the court to identify the issues raised on appeal is the functional equivalent to no concise statement at all." (citation omitted; some capitalization modified)). However, as the nature of Mother's claims in her concise statement are readily identifiable, we decline to find waiver. *See S.S. v. T.J.*, 212 A.3d 1026, 1032 (Pa. Super. 2019) (stating that the purpose of a concise statement "is to allow the trial court to easily discern the issues an appellant intends to pursue on appeal and to allow the court to file an intelligent response to those issues in an opinion pursuant to Pa.R.A.P. 1925(a)."); *see also* Trial Court Opinion, 8/30/24, at 15-24 (the trial court addressing the merits of each of Mother's claims).

would best serve the needs and welfare of [C]hild pursuant to 23 Pa.C.S.A. § 2511(b)?

Mother's Brief at 6 (citations modified).

We review the termination of parental rights for an abuse of discretion. *See In the Int. of K.T.*, 296 A.3d 1085, 1104 (Pa. 2023). This standard of review requires appellate courts to

> accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.
>
> As the Pennsylvania Supreme Court discussed in *In re: R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010), there are clear reasons for applying an abuse of discretion standard of review…. Unlike trial courts, appellate courts are not equipped to make fact-specific determinations on a cold record, where trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead, we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*Interest of K.T.*, 324 A.3d 49, 56 (Pa. Super. 2024) (brackets omitted) (quoting *In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012)).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [Section] 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [Section] 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Matter of Adoption of L.C.J.W.*, 311 A.3d 41, 48 (Pa. Super. 2024) (citation omitted).

"The standard of 'clear and convincing' evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re Adoption of C.L.G.*, 956 A.2d 999, 1004 (Pa. Super. 2008) (*en banc*) (citation omitted). Finally, this Court need only agree with the trial court as to "any one subsection of [Section] 2511(a), in addition to [Section] 2511(b), in order to affirm the termination of parental rights." *Int. of M.E.*, 283 A.3d 820, 830 (Pa. Super. 2022) (citation omitted).

Instantly, we examine Mother's challenge pursuant to Section 2511(a)(2), which provides:

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

- 11 -

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2). The petitioner must prove

> (1) repeated and continued incapacity, abuse, neglect or refusal;
> (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and
> (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*Interest of Z.N.B.*, ___ A.3d ___, 2024 PA Super 262, at *5 (Pa. Super. filed Nov. 7, 2024) (citation omitted). Grounds for termination "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *Id.* Further, "[p]arents are required to make diligent efforts toward the **reasonably prompt** assumption of full parental duties." *Id.* (emphasis added).

Here, Mother argues that "[t]he totality of the evidence demonstrated that Mother had developed the ability to understand [Child's] needs and to properly feed, diaper, and otherwise care for [Child]." Mother's Brief at 17. Mother continues:

> CYF testified that Mother had made progress. Achieva testified that Mother had made progress. Genesis of Pittsburgh testified Mother had made progress and praised Mother. The trial court abused its discretion by relying upon the opinion of Dr. [] Pepe[,] which was contradicted by other witnesses. …
>
> … [W]hile determinations of credibility are reserved for a trial court, an abuse of discretion occurs when a trial court does

- 12 -

not explain why the significant weight of contrary testimony … was not found credible.

*Id.* at 17-18.

The trial court addressed Mother's challenge to Section 2511(a)(2) in its

Pa.R.A.P. 1925 opinion:

There is nothing in the record that supports the successful completion or substantial compliance of Mother's parenting goal. Dr. [] Pepe … clearly and credibly testified that Mother was not competent to parent [] Child[,] and would not be able to parent [] Child without supervision. ***See generally*** CYF Exhibit 2 – Dr. Pepe Evals Combined; ***see also*** CYF Exhibit 3 – Combined Court Orders. Mother has an intellectual disability[, and an abbreviated IQ score of 50, which placed her in the deficient range of intellectual functioning]. ***Id.*** … Dr. Pepe conducted testing on Mother's overall adaptive functioning relative to her intellectual capacity, and Dr. Pepe explained in her report that the [evaluation] scores "assess what a person actually does rather than what he or she is able to do." ***Id.*** Mother's overall level of adaptive functioning placed her in the moderately lo[w] level, with low levels of function for communication and socialization. ***Id.***

In the instant case, the evidence and testimony overwhelmingly supported the proposition that Mother's intellectual and adaptive functioning complicated her ability to parent [] Child, whose significant developmental delays required a high level of attention to feeding and early intervention services. Even though Mother had improved her personal stability and received specific services through Achieva, Dr. Pepe testified that Mother did not know or understand what was required to parent [] Child. ***Id.***; ***see also id.*** at 19-23.

Trial Court Opinion, 8/30/24, at 16-17 (some capitalization modified).

Our review confirms the trial court's findings are supported by the

record, and free of legal error. Although Mother complied with the trial court's

order to attend parenting classes through Achieva, Mother's ability to parent

Child only minimally improved. Dr. Pepe opined that Mother does not have "a

clear idea of how to address [C]hild's developmental needs on a day-to-day basis." N.T., 7/15/24, at 21. Mother's claim that other witnesses contradicted Dr. Pepe's testimony is belied by the record. While Ms. Adams, Mr. Amago, and Ms. Reilly all testified that Mother had made progress towards her parenting goals since Child's removal from Mother's care, they also spoke to Mother's continued incapacity to care for Child in the long term. *See id.* at 42 (Ms. Adams testifying that Mother "will continue to need[] education and support" concerning her ability to parent); *id.* at 58 (Mr. Amago testifying that Mother "continues to need hands-on support to effectively feed [C]hild"); *id.* at 117 (Ms. Reilly agreeing there was "always more progress to be made" concerning Mother's independent living skills).

The trial court acted within its discretion when it credited Dr. Pepe's uncontradicted testimony. *See L.C.J.W.*, 311 A.3d at 48 ("It is the province of the [trial] court to assess credibility and resolve any conflicts in the evidence, and in doing so it is free to believe all, part, or none of the evidence presented." (citation and quotation marks omitted)). Accordingly, we discern no error in the trial court's determination that CYF proved, by clear and convincing evidence, that termination of Mother's parental rights was warranted under Section 2511(a)(2). *See K.T.*, 324 A.3d at 56 ("an appellate court must … defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of

an error of law or an abuse of discretion."). Mother's first issue merits no relief.[8]

In her final issue, Mother challenges termination under 23 Pa.C.S.A. § 2511(b). Mother baldly claims that "the trial court abused its discretion and/or erred as a matter of law in concluding that termination of Mother's parental rights best served the needs and welfare of [Child.]" Mother's Brief at 21.

When the trial court finds grounds for termination under Section 2511(a), it must separately consider a child's needs and welfare:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. ….

23 Pa.C.S.A. § 2511(b).

"Notably, courts should consider the matter from the child's perspective, placing [their] developmental, physical, and emotional needs and welfare above concerns for the parent." **K.T.**, 296 A.3d at 1105. Courts must also "discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." **Id.** (citation

---

[8] Because we agree with the trial court that CYF met its burden with respect to Section 2511(a)(2), we need not address Mother's second and third issues, which implicate other subsections of Section 2511(a). **See Int. of M.E.**, 283 A.3d at 830.

omitted). However, "the parental bond is but one part of the overall subsection (b) analysis." *Id.* at 1113.

> The Section 2511(b) inquiry must also include consideration of other important factors such as: the child's need for permanency and length of time in foster care …; whether the child is in a pre[-]adoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability.

*Id.* (footnote and citations omitted).

Instantly, the trial court explained as follows concerning its determination under Section 2511(b):

> The [trial] court does not dispute that Mother loves [] Child[,] and has a desire to parent [] Child. Nevertheless, the [trial] court must give "primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] §[ ]2511(b). At the time of the termination hearing, [] Child was [eighteen] months old and had significant developmental delays that required early intervention services through speech, physical, occupational, and feeding therapies. *See generally* CYF Exhibit 1 - Achieva Reports Combined; CYF Exhibit 2 - [Dr.] Pepe Evals Combined; CYF Exhibit 3 - Combined Court Orders. Dr. Pepe's expert opinion … was that the visitation schedule with Mother twice a week for three hours, combined with the many early intervention services and treatments, was too much for [] Child[,] and was interfering with [Child's] functioning and development. CYF Exhibit 2 - Dr. Pepe's Evals Combined. … Dr. Pepe noted that [] Child appeared more calm and less distressed [after Mother's visitation was reduced]….

> Dr. Pepe assessed [] Child to be bonded and attached to her foster parents, who had been functioning in a parental role since [Child] was placed into their home shortly after birth. *Id.* Dr. Pepe believed that it was in the best interest of [] Child to achieve permanency through adoption with her foster parents, who were meeting her needs and providing necessary love, security, and support for her overall physical and emotional well[]being. *Id.*

… Mr. Amago testified it was his observation that the foster parents had been instrumental in helping [] Child to do as well as she was doing. [N.T., 7/15/24, at 76.] Mr. Amago also noticed, like Dr. Pepe, the improvement in [] Child's overall function and stress level with the decreased visitation. *Id.* at 77. Mr. Amago testified that CYF does not [believe] there to be [a] necessary and beneficial bond between [] Child and [] Mother, and does not believe there would be a detriment to [] Child if [parental] rights were terminated [as] to Mother. *Id.* at 75. CYF felt confident that the foster parents, who were pre-adoptive, provided the safety and security that [] Child requires, and termination would best serve [] Child's needs and welfare. *Id.* at 77.

Mother failed to present any credible testimony or evidence to overcome the aforementioned testimony and evidence that supported the conclusion that termination best served Child's needs and welfare. This court found that any potential negative impact, should one exist, would be mitigated by the loving and secure relationship [] Child and foster parents had established over the course of [Child's] entire life, and that termination would best meet [] Child's developmental, physical and emotional needs and welfare.

Trial Court Opinion, 7/15/24, at 22-24.

We agree with the reasoning and conclusion of the trial court, as it is supported by the record and free of legal error. The trial court acted within its discretion when it credited the testimony of Dr. Pepe and Mr. Amago. *See L.C.J.W.*, 311 A.3d at 48. Child has benefited from the care of her foster parents since being discharged from the hospital after her birth, and she is entitled to permanence. *See In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006) (observing that a "court cannot and will not subordinate indefinitely a child's need for permanence and stability to the parent's claim to progress and hope for the future."). Accordingly, Mother's final claim merits no relief.

- 17 -

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 01/17/2025